In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-23-00321-CR
_____

JUSTIN AVERY CLARABUT, Appellant

V.

THE STATE OF TEXAS, Appellee

**On Appeal from the 435th District Court**
**Montgomery County, Texas**
**Trial Cause No. 22-08-09817-CR**

**MEMORANDUM OPINION**

A jury convicted Justin Avery Clarabut of the first-degree felony offense of murder of Brent Purvis, rejecting his self-defense claim. In a special issue, the jury found that the offense was the result of sudden passion and assessed punishment at fifteen years of confinement. The trial court sentenced Clarabut accordingly. Clarabut challenges the trial court's judgment, and in two issues argues that: (1) the evidence was insufficient to support a jury finding against him on the self-defense issue beyond a reasonable doubt; and (2) the trial court committed harmful error by

refusing to include his requested instruction on apparent danger. We hold (1) the evidence was sufficient for the jury to reject the claim of self-defense beyond a reasonable doubt, and (2) the trial court did not err by refusing to include an apparent danger instruction. For the reasons explained below, we affirm the trial court's judgment.

## BACKGROUND AND TRIAL EVIDENCE

### Overview of Events

The events in this case occurred one evening in July 2022 in a Conroe residential subdivision. At that time, Clarabut, lived in a house on Fife Street and had lived there for about nine months with his wife and young son. The complainant, twenty-seven-year-old Brent Purvis, had parents who lived in the same neighborhood but not on the same street. Clarabut testified he did not know Purvis and had never seen the black Range Rover driven by Purvis in the neighborhood.

Shortly before the shooting, Clarabut and Purvis first encountered one another where traffic merged on South Loop 336 between 5 and 6 p.m., as captured on another driver's dashcam video. Clarabut was in the left lane, and Purvis was in the right lane that was ending, so Purvis had to merge to the left. Rather than falling in behind Clarabut, Purvis accelerated and tried to cut in front of Clarabut, who did not allow him to cut in the line of traffic. By Clarabut's own testimony, this was because

2

he "didn't want to." Purvis was forced to merge into the traffic directly behind Clarabut.

After turning right off Loop 336, both cars entered the Stewart's Forest neighborhood at a high rate of speed. Initially Clarabut was driving in the right lane, and Purvis was driving behind him in the same lane. Soon, Purvis swerved into the left lane passing Clarabut, then steered back to the right lane, cutting in front of Clarabut's vehicle. Dashcam video showed both drivers making another right turn within the subdivision, with neither of them stopping at a stop sign, and Clarabut's vehicle and Purvis's vehicle are close to each other.

Farther into the neighborhood, the undisputed evidence is that there was an altercation between Clarabut and Purvis where they stopped side-by-side. Witnesses gave varying accounts of what happened at this point. Clarabut claimed that Purvis swerved his Black Range Rover toward Clarabut's truck like he was trying to hit Clarabut. Clarabut testified they exchanged words, with Clarabut asking him "What's your f*cking problem?" Clarabut testified that Purvis got out of his Range Rover and took a swing at Clarabut through his open window, but Purvis's other hand remained in his pocket, and Purvis said, "Let me show you something[.]" The witness with the dashcam was going straight, so the cars were no longer seen on video, but this witness stopped at the same stop sign Clarabut and Purvis ran. While stopped, the witness observed both vehicles stopped, and saw Purvis angrily exit his

3

vehicle but he did not see Purvis's hands in his pocket or Purvis swerve at Clarabut. That said, the witness admitted he did not see the entire interaction.

It is undisputed that once in the neighborhood, the evidence shows Purvis and Purvis's Black Range Rover followed Clarabut around the neighborhood. There are somewhat inconsistent accounts of another potential interaction near the entrance to the neighborhood where Clarabut and Purvis may have exchanged additional words, although one witness said she never saw Purvis stop there. The evidence is also uncontradicted that after passing his house once without stopping, Clarabut eventually pulled into the driveway of his home. As Clarabut pulled into Clarabut's driveway, Purvis was still following Clarabut. Clarabut sat inside his truck for a few moments watching Purvis's vehicle pass, but then Purvis made a u-turn in a nearby cul-de-sac then slowly came back toward Clarabut's house and pulled up across the street from Clarabut's truck and driveway, with the window down Purvis began yelling at Clarabut. This sequence of events was captured and recorded by Clarabut's home Ring camera.

The Ring camera also captured the events that unfolded thereafter. Clarabut exited his truck with a handgun in his right hand but holding the gun down by his side, as Purvis and the black Range Rover slowly came toward Clarabut. The video shows that Purvis remained seated in his black Range Rover, Purvis is heard shouting something and Clarabut responds, but some of what was said is

4

unintelligible. The video showed that from the time Clarabut exited the vehicle, and the time he raised his weapon and fired the first shot, a little more than three seconds elapsed. At one point on the camera footage, Purvis can be seen leaning forward or turning his body in the vehicle. After Clarabut fired once, the vehicle kept moving and almost immediately Clarabut fired a second shot. Purvis's vehicle eventually crashed into Clarabut's neighbor's vehicle which was parked up the street. Immediately after the shooting, Clarabut called 911 and told them he had "discharged his weapon."

At trial, Clarabut testified that based on the continued pursuit and events that had unfolded before the shooting when Purvis turned or leaned forward inside the Range Rover, he believed Purvis was reaching for a weapon and that if he did not shoot, he would have been killed. A defense expert testified that Purvis was justified in shooting and described Purvis's movement in the vehicle as a "furtive movement." In contrast, the State's expert broke down the video frame by frame and testified that Purvis only turned in the car after Clarabut raised the weapon at him. The State's expert testified that once Clarabut raised his weapon, he fired the first shot within 1.65 seconds.

Enhanced audio from the Ring camera captured Clarabut saying, "F*ck off," after he fired the second shot. Clarabut gave statements to a Conroe police officer and a detective at the scene. At no time after the accident did he mention that he

5

believed Purvis was reaching for a gun, even though one officer expressly asked that question. Instead, he told officers that he saw Purvis "fidgeting" with the door handle and fired his gun when he believed that Purvis was going to get out of the car. The State argued that the footage from the Ring Doorbell and Clarabut's statements given at the scene contradicted Clarabut's trial testimony that he believed Purvis was reaching for a weapon when he shot. No weapon was found on Purvis or in his vehicle.

**Testimony of Jose Hernandez[1]**

Jose Hernandez testified that he lived in the general area where the shooting happened. Jose explained that on July 28, 2022, he "was behind the wheel following two vehicles that seemed to get in an altercation[]" and had video of certain events. He learned about the case from neighborhood social media alerts. People posted photographs of the vehicles involved on social media, and the altercation already caught Jose's attention, so he pulled his dashcam video footage. Jose then reached out to police and the district attorney's ("DA") office about his dashcam video, and he provided the DA's office with a copy.

During Jose's testimony, the dashcam video was played for the jury. The dashcam video showed Jose on his way home from work between 5 and 6 p.m.,

---

[1]Since another witness has the same last name, we refer to this witness as "Jose" for purposes of clarity.

driving behind Clarabut's white truck. Jose said his normal route is north towards Conroe, and they turned right on South Loop 336 until they arrived near the Stewart's Forest neighborhood. They approached a merge sign, and Jose explained that is where the right lane ends. The video showed traffic began to slow near the merge sign. Jose testified that issues at the merge location are common, and you can let people pass there, but "some people get aggressive."

The video showed that as the right lane ran out, a black Range Rover passed Jose on the right side while Clarabut's vehicle was still in front of Jose. The black Range Rover then tried to go past Clarabut on the right shoulder as the right lane ran out, but Clarabut appeared to accelerate and would not let the Range Rover in front of him. So the Range Rover fell in behind Clarabut and in front of Jose. Jose explained, "The black vehicle, basically, drives forward and gets in the merging lane. His lane ends and tries to merge and the white truck accelerates and – blocking the access to the other cars. So, he gets on the shoulder." Jose testified that the Range Rover had room to merge until the white truck accelerated.

The white truck followed by the black Range Rover turned right off 336 and onto Stewart Forest Drive with Jose still traveling behind them. Jose testified that the white truck and Range Rover drove faster than the posted speed limit. Eventually, the white truck remained in the right lane, the black Range Rover moved to the left lane, and they traveled side by side, but Jose did not observe any contact or gestures

7

between them. Jose testified the video showed the Range Rover then moved into the right lane, cutting Clarabut off. Jose also observed that the white truck had to brake when the black vehicle cut over. The last thing Jose's video shows is the Range Rover followed closely by Clarabut with both turning right onto a side street named Tartan without stopping at a stop sign. Jose then went straight.

Jose explained that although not captured on video, he watched them for a moment after they turned right on Tartan. He saw the white truck on the right with the black Range Rover on the left. Jose testified he saw the Range Rover's driver exit the Range Rover "seemingly upset." That driver walked around and confronted the other person who was in the white truck, which was the last thing Jose saw. Jose was "pretty sure" the driver of the Range Rover did not have his hands in his pockets at that time, although there were points where the driver walked around the front of his vehicle that Jose did not have a full view of what he did. He saw nothing preventing the white truck from turning right or the black vehicle from turning left when they stopped next to each other. He did not see whether the driver of the white truck had his window down. He also testified he never saw the black vehicle try to strike the white vehicle, but he did see them stop.

**Testimony of Samantha Lusk**

Samantha Lusk, a witness to the shooting, testified that she was with her two sons in the neighborhood, parked down the street at the corner of Fife Drive and

8

Chanty Way in a relative's driveway when the shooting occurred. It was her first time in the neighborhood, and she was unfamiliar with the cross streets. Her husband went into the relative's home, while she and her children waited in their truck. One of her children was the first to notice that a white truck and black Range Rover had passed by them several times going "pretty fast," and they seemed to be following each other. That prompted her to pay closer attention, and the first time she noticed the vehicles, they passed her cousin's house "down Fife Road towards the cul-de-sac."

Lusk testified, "The white truck was going pretty fast for being in a subdivision, and the Range Rover was staying close up to him." Lusk did not know how many times the vehicles passed but thought it was twice. She was unsure what was happening but told her kids "[t]o get down." Lusk's attention was divided between watching the vehicles and her children.

Lusk observed the white truck pull into his driveway and noted his brake lights, but she could not tell which direction the truck pulled in from. She then saw the Range Rover come back down Fife and slowly U-turn at the intersection of Chanty and Fife, but she never saw the Range Rover stop at that intersection. After the Range Rover slowly U-turned, it drove "back in front of" her cousin's house and was going "pretty slow . . . when everything unfolded."

9

Lusk testified the Range Rover "just creeped [sic] down the street, and then, there was gunshots." Lusk explained that the Range Rover continued "going slowly" down the street until right in front of the driveway where the white truck was but never fully stopped. When she first heard the shots, she did not know where they came from, then she saw "the flash . . . the last flash of the bullet." When Lusk heard the shots and saw the flash, she yelled at her kids to stay down, then she jumped from the truck and "started running towards the defendant." Lusk testified that when she asked Clarabut who shot, "[H]e looked at me and said, I shot. I'm the only one that shot. He was just nonchalant, just, Oh well. I did it." After she spoke with Clarabut, Lusk saw a police officer coming down the street, and she started screaming that he was the one who shot. She then ran towards the victim. Lusk said that Clarabut warned no one the victim was dangerous. Lusk estimated ten or fifteen seconds elapsed from the time she first saw the Range Rover to the first gunshot.

**Testimony of Danny Phillips an Accident Reconstructionist**

The State called expert witness Danny Phillips, an accident reconstructionist, to testify during trial. Phillips described his educational background and training, which included degrees in mathematics with a physics focus and extensive accident reconstruction training. Phillips testified that police performed a 3D scan of the crime scene in this case, and he used that data, along with the video evidence to reconstruct what happened. He put the 3D data and video evidence "together in a

graphical timeline" to "connect the dots into one cohesive unit." The 3D data collected by police involved a laser scan using a FARO S350 device, and Phillips also used that data to view the scene.

Phillips testified he performed a 3D analysis of the traffic conflicts that showed the relative speed changes. He also analyzed the video versus the audio, which included providing expanded video and enhanced audio of the shooting. Phillips performed a photo match of the 3D analysis of the shooting to recreate the scene. Phillips explained, "We were able to use that video of the actual shooting . . . and that laser scan data to create a 3D environment[,]" and analyze that data.

Phillips reviewed a large amount of digital data in this case, including photographs, dashcam video, Ring camera video, and the 3D data. During his testimony he described the events based on his reconstruction analysis, some of which included Ring camera video of the shooting, as they played for the jury.

Phillips testified that he saw nothing that suggested Purvis put his vehicle in park across from Clarabut's driveway, although he could not "definitively say" whether "it's always in drive[.]" Phillips said from the time Clarabut stepped onto the ground until he raised his weapon was 1.75 seconds, and from the time he raised the gun until he fired the first shot was 1.65 seconds. Phillips said as they went frame-by-frame through the video, they saw the gun at Clarabut's side and Purvis looking at him, then Clarabut moving forward with the gun still at his side and Purvis

11

continuing to look at him. Then, the video showed when Clarabut raised his arms into position, Purvis moved inward and forward inside the Range Rover, which Phillips described "as beginning of a crouching movement, and you see his vehicle beginning to move forward."

Phillips described with the frame-by-frame analysis that Clarabut fired the first shot between frame 721 and 722, then later in frame 722 is when Purvis begins "to recoil" and "move backwards" toward the steering wheel. The second shot occurred between frame 758 and 759, which was about 1.8 seconds after the first shot. At the time of the second shot, Phillips described Purvis moving "inward" and "lean forward a little bit[.]" Phillips explained that he enhanced the audio, which was played for the jury. Immediately after the shooting, as Purvis's vehicle pulled away, Clarabut is heard saying "f*ck off."

**Testimony of Cesar Hernandez**

Officer Cesar Hernandez with the Conroe Police Department testified at trial. In July 2022, Hernandez worked patrol and recalled being dispatched to Stewart's Forest about 5:53 p.m. Hernandez was one of the first officers to arrive, and Purvis's vehicle was already in a yard down the street. Hernandez testified that a female witness pointed out Clarabut as the shooter. He described Clarabut's demeanor as "[c]alm and collective [sic]" and agreed Clarabut cooperated. He did not feel that Clarabut behaved suspiciously.

12

During Hernandez's testimony, condensed video footage from his bodycam was played for the jury showing his first conversation with Clarabut. The video showed Hernandez explaining to Clarabut that he was detained, reading Clarabut his Miranda warnings, and Clarabut consenting to speak with him. Based on this first conversation with Clarabut, Hernandez believed that Purvis was outside of his vehicle when he was shot. This was because Purvis told Hernandez that Purvis had "his hands in his pockets both times." Clarabut also told Officer Hernandez that it looked like Purvis was getting out of his vehicle and that is when he discharged his firearm. Clarabut claimed he also told Purvis "several times" that he needed to "get back."

The video also showed Hernandez ask Clarabut if he thought the other driver was going to use a gun, and in response, Clarabut said, "I didn't know what he was going to." Later, Clarabut told Hernandez on the video that Purvis never actually exited his vehicle, and again, "it looked like he was opening his door, and that's when I discharged my firearm." He also told Hernandez he saw Purvis "fidgeting with the door handle."

Hernandez testified that he and other officers tried to locate the two shell casings. While Hernandez was still on the scene, Clarabut allowed him to review his Ring camera footage. Based on Clarabut's initial statement, the Ring video was not what Hernandez expected. Hernandez testified that Detective Dunn arrived on the

13

scene, took over the investigation and spoke further with Clarabut. After Hernandez spoke with Detective Dunn, and Dunn spoke with Clarabut, Hernandez took Clarabut to the police department for further questioning.

**Testimony of Officer Shelby Smith**

Officer Shelby Smith with the Conroe Police Department also testified. Smith works for Conroe PD as a patrol officer, canine handler, and part-time SWAT operator. On July 28, 2022, Smith received a priority dispatch for a "shots fired" situation. When Smith arrived, it was "chaotic" with citizens flagging him down.

When Smith approached the vehicle in the yard, he found Purvis injured inside. Bystanders gave Smith a towel, which he used to apply pressure to a gunshot wound in Purvis's chest, but he found no gun inside Purvis's vehicle. Smith testified that no gun or ammunition was found later, either, when the vehicle was processed. Although Smith knew of no people on the street during the shooting, when he arrived, there were "quite a few[,]" and he was unaware of any evidence that Clarabut warned anyone about a firearm in the Range Rover. Smith testified he found no evidence there was a firearm in the Range Rover on the date of the shooting. During Smith's testimony, he discussed several photographs of the scene admitted into evidence.

**Testimony of Michael Cary**

Michael Cary, a crime scene investigator with Conroe PD testified regarding evidence collection at the scene. Cary testified that on July 28, 2022, he received a

14

case in Stewart's Crossing, which is in Montgomery County. He arrived at the scene at about 6:46 p.m. Cary explained there were three parts of the scene: (1) Clarabut's address where the shooting occurred; (2) in the street where Purvis's car hit another vehicle; and (3) the location where Purvis was found in his car.

Cary explained that with a large scene like this, they begin by using a FARO measuring instrument to take laser scans and get distances and take photographs. Cary described the evidence he collected at the scene, which included, among other things, one shell casing, a projectile from inside Purvis's vehicle, and Clarabut's firearm with the magazine and cartridges. He said they could not locate the second shell casing, despite searching with metal detectors. Cary knew that Clarabut told Officer Hernandez that Purvis had come to his vehicle and taken a swing at him before the shooting, but Cary testified that he did not dust Clarabut's truck door for fingerprints or try to swab the door for DNA. He said that they did not find any firearms in Purvis's vehicle when they processed it. Cary also discussed multiple photographs taken at the scene that were admitted into evidence. He explained that Purvis's vehicle hit a truck parked in the street and pushed it into a neighboring yard and another car into a garage door.

**Testimony of Detective Darrick Dunn**

Detective Darrick Dunn from the Conroe PD testified about the shooting investigation. Dunn explained he was the on-call detective, so on July 28, 2022,

about 6:00 p.m. he received calls about the shooting and arrived at the scene at 6:38 p.m. As the lead detective, Dunn decided what needed to be done. They canvassed the neighborhood for video and talked to potential witnesses.

When Dunn arrived, he met with other officers and detectives, who provided a "rundown" of what happened. He first asked who the suspect was, then he spoke with Clarabut. Dunn testified that Clarabut "didn't seem distraught[,]" and instead, "seemed calm[.]" Dunn found that unusual, considering that he just shot at someone, although he agreed this was Dunn's first investigation where someone discharged a gun at someone else.

Dunn said that he read Clarabut his *Miranda* rights while Clarabut was in the patrol car, and Clarabut willingly provided a statement which Dunn recorded on his bodycam. The statement Clarabut gave Dunn was his overview of what happened, and Clarabut did a walk-through of what occurred, which was also recorded. They later transported Clarabut to the police station, where he said he wanted a lawyer.

While Dunn was on the scene, he noticed that Clarabut had a doorbell camera, so he asked Clarabut if he could review that video. Clarabut allowed Dunn to review it, which he did on Clarabut's cell phone after Clarabut did the walk-through of events. After watching the video, they took Clarabut to the station, where they arrested him. Following the arrest, Dunn reviewed additional evidence, including

16

the weapon, dashcam video, and the 9-1-1 recording. Dunn testified that the dashcam video did not change his decision to arrest Clarabut.

During Dunn's testimony, the 9-1-1 call and Clarabut's statement to Dunn were played for the jury. Dunn testified that in the 9-1-1 call, Clarabut never mentioned Purvis having a weapon. Likewise, Clarabut never mentioned that Purvis had a gun or that he believed Purvis had a gun when he gave his statement to Dunn. Clarabut also never told Dunn during his statement that he ran the stop sign behind Purvis and caught up to Purvis when they turned into the neighborhood. Dunn testified that Clarabut did not say that he yelled at Purvis, only that he responded to Purvis's yelling. Clarabut mentioned that he cursed at Purvis when they were at the intersection. Regarding Clarabut's claim in his statement that Purvis came over and swung at him, Dunn testified that someone taking a swing is not automatically deadly force. Despite Clarabut's statement that Purvis reached in the car and tried to swing at him, they did not check Clarabut's truck door for Purvis's fingerprints or DNA.

Dunn outlined the possible offenses Purvis potentially committed during the traffic conflicts. That said, upon reviewing the Ring camera video, Dunn testified the only offense Purvis committed while outside Clarabut's house was disorderly conduct, a Class C misdemeanor. Dunn disputed the defense's statement that neither an officer nor the defendant should have to wait to shoot in this situation.

17

**Testimony of Dr. Kathryn Pinneri**

Dr. Kathryn Pinneri testified that she is the Director of Montgomery County Forensic Sciences. On July 29, 2022, Pinneri performed Purvis's autopsy. Pinneri opined that Purvis's manner of death was homicide, and his cause of death was a "penetrating gunshot wound of the chest." During Pinneri's testimony, several photographs were shown to the jury of Purvis's autopsy, which she discussed. An autopsy photograph showed the entry wound in the front upper left part of his chest.

Pinneri testified the bullet entered Purvis's left, upper chest and went through a rib. She explained that the bullet travelled through the top of the left lung, through one of the major veins that takes blood back to the heart, through a major artery that comes off the aorta, through the top of the right lung, and lodged near the back of the right armpit. The bullet did extensive internal damage, and it would have been difficult to treat the injuries and prevent loss of life, given their location.

Pinneri explained that a firearm is a deadly weapon capable of causing serious bodily injury, and the bullet she recovered from Purvis's body caused his death. A person injured like this would have difficulty controlling their bodily movements and a motor vehicle if they were operating one.

**Testimony of JoAnn Purvis[2]**

Purvis's mother, JoAnn Purvis testified at trial. In July 2022, they lived in the Stewart's Forest subdivision and had done so for fifteen years. Purvis visited her home there. JoAnn was home when the shooting happened. She said that she was waiting for Purvis; she had surgery recently, and Purvis was coming to check on her. Instead, two detectives came to her house and delivered the news. JoAnn identified Purvis in court in an autopsy photograph.

**Testimony of Ken Lewis**

Ken Lewis, a defense expert, testified that he is a "trainer" of safety, firearms use, use of force, and the practical application of force. He described his education, training, and experience for the jury. He testified that you "want to use the minimum force necessary to interrupt the course of conduct that if allowed to continue, could cause death or serious bodily injury to myself or another person."

Lewis testified that he reviewed the evidence here, including: the indictment; the witness statements; detective and police reports; Clarabut's statements; bodycam footage; the Ring camera video; and Jose's dashcam video. Lewis testified that he would opine, based on the evidence he reviewed, how an objective and prudent person would react under these circumstances applying the use of force model.

---

[2]For purposes of clarity, we refer to this witness by her first name.

Lewis discussed the traffic interactions leading up to Purvis's pulling up behind Clarabut's driveway and characterized the surveillance video from Clarabut's home as "extremely important." After the multiple traffic encounters, Purvis pulled up and tried to verbally engage Clarabut behind his driveway, which Lewis described as "active resistance." In response, Clarabut "gets out of his truck using force," which "means he has his firearm in his hand in case he needs to use that if he perceives that, that next step is going to take him into assault of bodily harm[.]" Lewis explained there was nothing wrong with Clarabut's pulling out a weapon, and it was "a normal progression." This was because Purvis had not stopped progressing or left the situation; the perception of risk would have gone away if Purvis went away. Lewis said that Purvis refused to stop the encounter, was in front of Clarabut's house, and "trying to bait him out."

Lewis testified that under these circumstances, it was acceptable for Clarabut to display a handgun under Texas law. Lewis explained that "the law says that I may demonstrate force to let you know that I will use force or deadly force, as appropriate, if necessary." He testified that Clarabut was standing in the driveway holding a firearm, but Purvis moved forward or down as if he was going to make another furtive movement towards Mr. Clarabut[.]" Lewis opined, "[T]hat is where it went right to deadly force being justified, . . . because of the attack that I saw building up

20

all the way through the fifth contact by Mr. Purvis." Lewis defined furtive as "where I am concealing myself or secretly reaching for a weapon or means to attack you."

Lewis testified it did not matter that Purvis had no weapon in his vehicle. According to Lewis, when Purvis was outside Clarabut's house, what mattered was "the reasonable perception of risk based on Purvis' actions up to this point[,]" given that this was their fifth contact. In Texas, a person does not have to attack you with a weapon before you use deadly force. Lewis testified that "Clarabut was fully justified in using deadly force to protect himself . . . based on the circumstances." Later, Lewis testified that for self-defense, Texas defines reasonable belief as a belief held by an ordinary and prudent person. As an expert in the use of force, Lewis said he looked at the totality of the circumstances. He also described apparent danger as being "the facts that are presented to me, and it's how I receive and perceive that threat." Lewis explained that Texas law views apparent danger and actual danger the same, in essence, how a reasonable person perceives it based on what they knew at the time.

Lewis formed his opinion about whether the shooting was justified based on the information he had before he met with Clarabut. He said that he did not receive any new information when he met with Clarabut, and nothing Clarabut said changed his opinion about the shooting.

21

Before he testified, Lewis was unaware the shooting occurred at about thirty-four feet, but it did not change his opinion. He agreed that if Purvis wanted to just fight or punch Clarabut, based on that distance, it would not be necessary to shoot him. Lewis indicated that Purvis did not have a firearm or show Clarabut a firearm, and Purvis never mentioned or mimicked a firearm in Clarabut's presence. Additionally, Lewis testified that Clarabut never told police or the 9-1-1 operator that Purvis had a firearm. Instead, Clarabut told Officer Hernandez that Purvis looked like he was getting out of his vehicle, which is when Clarabut shot.

Lewis also testified that Clarabut had enough time to warn Purvis three times as he claimed. Lewis noted that he thought he heard Clarabut tell Purvis twice on the video "to go away in some fashion." When Lewis learned during his testimony Clarabut did not say that, it did not change his opinion of the shooting. After listening to the enhanced audio, Lewis could not "completely" make out what was said.

Lewis did not measure the time it took for the shooting to unfold once Clarabut exited his truck but agreed Purvis had little time, only 3.4 seconds, to register and react to whatever Clarabut said. Lewis conceded it was possible Purvis did not see the weapon until it was raised, and Clarabut fired the first shot 1.65 seconds after he raised the gun. Lewis testified that the threat to Clarabut when Purvis was outside his driveway was not a physical attack but only a firearm attack. Yet, Clarabut told police that he was concerned that Purvis was opening his door—not that Purvis had

22

a weapon. So, based on what Clarabut said, he knew that Purvis was pulling on a door handle. Lewis agreed that people usually do not try to exit a vehicle that is in drive, but Clarabut told Dunn he believed that Purvis was getting out of the vehicle. Lewis testified that Clarabut's belief Purvis was exiting the vehicle did not give Clarabut the legal authority to shoot him.

After several hypothetical questions, Lewis testified that Purvis's turning inside the car was "the final factor" in his determination and is what triggered Lewis's opinion that Purvis could be reaching for a weapon. Lewis agreed that if all Purvis did was park outside Clarabut's house and yell, which Purvis had the right to do, Clarabut could not shoot. According to Lewis, what Purvis did in the seconds the firearm was present is important. From the time Clarabut exited his vehicle to the time he raised his pistol, he was moving forward.

Lewis testified that when Purvis was in front of Clarabut's house, he did not use force or attempted force. Specifically, when Purvis turned, he was not using force or attempted force, and if he was not, then under the Penal Code, Clarabut was not allowed to use force in response. Lewis agreed that if Clarabut was not authorized to use force, then he could not use deadly force. Even so, he opined that the "furtive movement" Purvis made inside the vehicle justified Clarabut's shooting him, as shown at ten seconds into State's Exhibit 10.

23

**Testimony of Justin Avery Clarabut**

Justin Clarabut testified and began by describing his firearms experience and training. Clarabut testified that he kept a handgun in his truck when he drove to and from work. He bought the handgun as protection for his family. The day of the shooting, he put the gun in his truck console before he went to work. In March 2021, he obtained his license to carry and was taught in those classes the importance of being reasonable and about necessity.

Clarabut testified that he left work that day around 5 p.m. and headed straight home. He hit traffic in the Woodlands, and exited onto South Loop 336 about 5:45 p.m., which is typical. He described the traffic as "stop-and-go" and said that he moved to the middle lane before the merge. Clarabut was focused on the vehicle in front of him and not paying attention to anything around him. He then saw something out of the corner of his eye, but the vehicle in front of him was stopping, and once he came to a stopping point, he looked over and saw the Range Rover with dark tinted windows. According to Clarabut, as they prepared to merge, it appeared the Range Rover tried to get in line in front of him. Clarabut indicated that he did not let him in, although he could have; he just did not want to.

After that, Clarabut "tracked behind the vehicle" in front of him, and the Range Rover, "seemingly calm" fell in behind him. As they traveled toward Stewart's Forest, Clarabut did not see the Range Rover do anything unusual. When

24

Clarabut turned onto Stewart's Forest, the Range Rover got in the turn lane behind him. Clarabut testified he became skeptical "of why he was doing that" given the earlier situation at the merge.

At the time, Clarabut had lived in the neighborhood for about nine months but had never seen the Range Rover there before. This made Clarabut wonder if the other driver lived there or if he was upset. This entered his mind when the Range Rover started speeding up in the left lane to pass him. Clarabut said as the Range Rover passed, it pulled over before it cleared Clarabut's vehicle, cutting him off. Clarabut relayed this angered him, because "[i]t felt intentional[,]" and he had to hit his brakes to keep from hitting the other driver.

They both turned onto Tartan, and Clarabut explained he ran the stop sign on the Range Rover's tail. He said, "I just wanted to give him a piece of my mind and ask him what his problem was[,]" and admittedly closed the distance between the vehicles. Clarabut noted that Tartan was two lanes after the turn, and the Range Rover was in the left lane, while Clarabut was in the right lane. According to Clarabut, as the Range Rover slowed and Clarabut approached, Purvis swerved the Range Rover at him then swerved back into his lane.

Clarabut testified that both vehicles then came to a complete stop at the stop sign, although there was no video of this encounter. Clarabut then rolled down his window and shouted, "What's your f*cking problem?" Clarabut testified that he

25

probably should not have done this but did not use or attempt to use force at that time. Clarabut noted he was still upset from the two times it seemed like Purvis intentionally tried to hit him. He explained that he only "wanted to have words with him[,]" and expected the other driver might yell back, then they would go their own ways.

Clarabut testified instead that the other driver exited his vehicle, told Clarabut he wanted to show him something, and shouted. Clarabut described the other driver walking quickly around the front of his car, then approaching Clarabut's window, "swinging his left arm and his right hand was in his pocket and his arm was locked." Clarabut stated that "as soon as he gets up to my window, he swung at me with his left hand." Clarabut characterized it as "weird" that his arm was locked with his hand in his pocket and wondered what the other driver would do. Clarabut testified that "his arm and hand came into my truck, and I duck out of the way so I wouldn't get hit."

Clarabut relayed that as Purvis walked up with his hand in his pocket, Clarabut reached to the console where his handgun was and prepared to open it if necessary. After Purvis swung at him, Clarabut said that Purvis called him "a punk ass white boy," then Purvis turned and walked away. Although Clarabut agreed Purvis used physical force "[m]ost likely" in response to Clarabut's verbal provocation, Clarabut responded by keeping his window down and driving away from the stop sign.

26

Clarabut said he did not have to open his console and get the gun, because Purvis turned and walked away, so Clarabut no longer felt Purvis was a threat. As Purvis got back in his vehicle, Clarabut decided to turn right and go home and thought Purvis was "done with the situation."

As Clarabut turned right off Tartan and onto Tavish, he remained aware of his surroundings and observed that before he turned left off Tavish onto Fife Street, the Range Rover was "creeping" and "change[d] direction" toward him. Clarabut explained that when Purvis turned left onto Fife behind him, it made Clarabut realize Purvis was still following him, so he "was worried." Clarabut explained that he did not know Purvis, what he was capable of, or how far he would take things. Clarabut testified that as he approached his home on Fife, he did not want Purvis to know where he lived, so he decided to pass his house.

Since Purvis was following him, Clarabut indicated he sped up to see if Purvis would do the same thing. Clarabut noted that Purvis "seemed really aggressive" so he thought if Purvis saw where he lived, Purvis could attack him again or come back later, and he "didn't want to take any chances." When asked why he did not call 9-1-1, Clarabut answered that he was "too focused on what the Range Rover was doing and trying to get away from him[,]" and did not feel that he could do both simultaneously.

According to Clarabut, Purvis eventually blocked the intersection leading out of the neighborhood, but Clarabut was able to get by and turn right on Fife. Clarabut testified that as he passed Purvis at the intersection, Purvis seemed to want to fight and said, "Hey, motherf*cker. Where are you going? What are we doing?" So, Clarabut responded, "F*ck off." Clarabut indicated he was still angry and nervous at this point. Given the Range Rover's movements at this time, Clarabut believed Purvis was leaving, so he felt it was safe to go home.

Clarabut described pulling into his driveway, shaking, and feeling disbelief that the situation progressed. He took several seconds to put his head down, breathe, and to tried to calm down. Clarabut said he did not think to call 9-1-1 at that point, either.

After a few moments, Clarabut noticed Purvis traveling down Fife in his direction. Clarabut stated that he remembered the stop sign on Tartan and did not know what was in Purvis's pocket and wondered whether Purvis would stop or drive by. Clarabut testified he did not go inside his house, because he had a "sticky" front door lock and that he would have to wait for the garage door to open and close; he said he did not think he had time for either. When asked why he did not call 9-1-1, he answered, "I didn't feel safe just sitting there helplessly."

Clarabut testified that he grabbed the gun, removed it from the holster, and held it while he watched Purvis. Clarabut then said that Purvis stopped directly

28

across from his driveway, "I didn't have a place[] to run[,]" and "couldn't get in the house in time," so he felt he must face Purvis. Clarabut saw Purvis shouting but could not hear him. Clarabut agreed that when Purvis yelled from his vehicle, Purvis neither used nor attempted to use force. Clarabut said he exited his vehicle with his gun by his side and walked towards Purvis's vehicle, but he agreed Purvis still did not use force. Clarabut described exiting his truck and thinking that "this guy just needs to leave and all this can be over[,]" and "everything went real quiet, and it just kind of felt like I was floating and like my body just took over."

Clarabut claimed he told Purvis he needed to leave, although he also said he was in a "weird state," and he did not remember what came out of his mouth. He testified that it looked like Purvis tried to open the door, so Clarabut raised his gun when he saw that and tried to tell him to leave. According to Clarabut,

> Shortly after that, he bent down – and again, thinking back to the stop sign and him constantly chasing me, blocking me and not knowing what he was really capable of and what he was going down for – I remember seeing my neighbor's house and he came back up and that's when I took two shots.

Clarabut claimed he shot, because he "thought [Purvis] was trying to open the door to get out, and he was reaching down to grab a gun and shoot me." He said he felt that if he did not shoot, he would be dead, although he again agreed that reaching for a door handle was not force. Clarabut admitted he tried to shoot Purvis and knew the first shot was low, so he fired the second shot. He testified that when he pulled

29

the trigger, he used deadly force. Clarabut also confirmed that in all their contacts leading up to the shooting, Purvis had not used deadly force. Clarabut did not know if he hit the man, but once the Range Rover drove off and hit another truck parked down the street, Clarabut felt it was "probably safe to turnaround" and called 9-1-1.

During Clarabut's testimony, several previously admitted exhibits were played and discussed for the jury, including the Ring video from his house, the 9-1-1 call, and Officer Hernandez's bodycam video. He explained some of his earlier comments on these recordings as the exhibits were played. Although he told the 9-1-1 operator he did not know if he hit the driver, once the driver crashed into a truck down the street, he thought he probably hit him. Clarabut clarified that when he told Officer Hernandez on video that Purvis hit him several times and had his hands in his pockets, he was referring to the instance on Stewart's Forest and Tartan. Clarabut testified those comments were not about when Purvis was right in front of his house. He acknowledged that he never told Hernandez why he discharged his firearm, but he thought Purvis would kill him, and it looked like Purvis "was trying to come out of the door and bend down for a firearm." Clarabut said, "I don't know[,]" when asked why he did not tell Officer Hernandez that. He also did not tell Hernandez that Purvis told him he had something to show him when they were at the stop sign. Clarabut testified that he did not tell any officers after the shooting that he thought Purvis was reaching for or going to use a weapon.

30

Clarabut testified that when Purvis pulled up behind his driveway, he did not immediately jump out and start shooting, because he did not see that as "an immediate threat." Clarabut said that when he got out with his gun by his side, he hoped Purvis would leave. Clarabut believed he should be angry about Purvis's behavior, but he did nothing that Purvis should have been angry about towards him.

**Testimony of Wendy Elliott**

Dr. Wendy Elliott testified as a defense expert and is a forensic psychologist. Elliott outlined the evidence she reviewed in this case, including the video evidence, 9-1-1 call, offense report, and Clarabut's military records, among other things. She also met with Clarabut. She testified that it was possible that Clarabut experienced memory loss after the shooting. She described the body's response to high stress situations and testified that in these situations, "our memories aren't always as accurate as they could be." Elliott also listed some symptoms of a dissociative state, which can vary.

Elliott testified that if Clarabut reported feeling like he had an out-of-body experience, it would be consistent with a dissociative state. She stated that Elliott looking calm and collected would also be consistent with experiencing a dissociative episode from a traumatic event. Elliott explained that it appeared he managed his emotions throughout the entire episode. She also stated that some things Clarabut

reported, like heart pounding, lightheadedness, and repeating himself could also be symptoms of a dissociative state.

With respect to Clarabut's representing to Officer Hernandez that he told Purvis to go away several times, Elliott believed it was possible Clarabut mis-remembered, and she explained adrenaline could contribute to that. She testified it did not necessarily mean that Clarabut lied. Elliott stated that when she interviewed Clarabut, she had no reason to believe he was not forthcoming, and his interview matched the historical information she had.

**Additional Evidence**

Multiple videos were admitted into evidence and played for the jury, including Ring camera footage showing the shooting from Clarabut's driveway, Jose's dashcam, Officer Hernandez's bodycam showing his interview with Clarabut, and Detective Dunn's bodycam showing his interview with Clarabut. These video recordings captured the events immediately before, during, and after the shooting and were played repeatedly at trial for the jury. A recording of Clarabut's 9-1-1 call was also admitted and played for the jury.

Additional evidence included, among other things: photographs of the vehicles, scene, and Purvis; a timeline of events showing the length of time between shots; autopsy photographs; accident recreations; frame-by-frame analysis; photographs of Purvis's injuries; Lewis's demonstratives and graphics for use-of-

force testimony; a list of Purvis's movements with a frame-by-frame range showing when shots occurred; and photographs of Clarabut's gun, magazine, and ammunition.

**Jury Charge and Charge Conference**

Although the jury charge tracked the language in Texas Penal Code section 9.31 and 9.32 governing self-defense, Clarabut requested a special non-statutory instruction on the issue of apparent danger. The trial court denied the defense's proposed apparent-danger instruction, reasoning that the proposed language has been included with the burden of proof, and the charge tracked Penal Code sections 1.07, 9.31, 9.32, and article 38.36. The trial court added that the defense could argue apparent danger "within the confines of the statutory language." A copy of Clarabut's proposed instruction of apparent danger was included in the record.

**Guilty Verdict and Punishment**

The jury found Clarabut guilty of murder as charged in the indictment. After the punishment hearing, the jury made an affirmative finding in response to the sudden-passion issue and assessed punishment at fifteen years of confinement. The trial court sentenced Clarabut accordingly.

## ISSUE ONE: SUFFICIENCY OF THE EVIDENCE

In his first issue, Clarabut complains the "undisputed evidence" does not support a jury finding against him on the self-defense issue beyond a reasonable doubt, therefore, the evidence is insufficient. The State responds that the evidence is

viewed in the light most favorable to the verdict, a rational juror could have reasonably rejected Clarabut's testimony. The State also argues, among other things, that a rational juror could have found that Clarabut did not believe deadly force was immediately necessary, or any such belief was not reasonable under the circumstances.

## Standard of Review and Applicable Law

In evaluating legal sufficiency of the evidence to prove the charged offense, we view all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see also Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). Under the *Jackson* standard, we defer to the jury's responsibility to fairly resolve conflicting testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *See Metcalf*, 597 S.W.3d at 855; *Hooper*, 214 S.W.3d at 13, 16–17. The jury as factfinder is the sole judge of the weight of the evidence and witnesses' credibility, and it may believe all, some, or none of the testimony presented by the parties. *Metcalf*, 597 S.W.3d at 855 (citations omitted). We do not reweigh the evidence or determine the credibility of the evidence, nor do we substitute our judgment for the factfinder's. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (citation

34

omitted); *see also McPherson v. State*, 677 S.W.3d 663, 664 (Tex. Crim. App. 2023).

"Each fact need not point directly and independently to a defendant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016) (citation omitted).

A person commits murder if he "Intentionally or knowingly causes the death of an individual[.]" Tex. Penal Code Ann. § 19.02(b)(1). Texas recognizes the defense of justification, which excludes criminal responsibility for otherwise criminal behavior. *See id.* § 9.02. Self-defense is one type of justification. *See id.* § 9.31. "[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a); *Gamino v. State*, 537 S.W.3d 507, 510 (Tex. Crim. App. 2017). A person is justified in using deadly force if he would be justified in using force under section 9.31, and he reasonably believed that deadly force was immediately necessary to protect himself against another's use or attempted use of deadly force. *Gamino*, 537 S.W.3d at 510; *see also* Tex. Penal Code Ann. § 9.32(a). "Deadly force" is defined as "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." Tex. Penal Code Ann. §

35

9.01(3). "[R]easonable belief" is a "belief that would be held by an ordinary and prudent man in the same circumstances as the actor." *Id.* § 1.07(42).

As for the defense of justification,

> a defendant bears the burden of production, which requires the production of some evidence that supports the particular defense. Once the defendant produces such evidence, the State then bears the burden of persuasion to disprove the raised defense. The burden of persuasion is not one that requires the production of evidence, rather it requires only that the State prove its case beyond a reasonable doubt. When a jury finds the defendant guilty, there is an implicit finding against the defensive theory.

*Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003) (citing *Saxton v. State*, 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991)); *see also Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018). In reviewing a challenge to the sufficiency of the evidence to support the jury's implicit rejection of self-defense,

> we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt.

*Saxton*, 804 S.W.2d at 914 (citations omitted); *see also Braughton*, 569 S.W.3d at 608–09 (citation omitted). Self-defense is a fact issue the jury determines, and it is free to accept or reject any defensive evidence on the issue. *See Saxton*, 804 S.W.2d at 913–14. A jury's guilty verdict constitutes an implicit finding that it rejected the defensive theory. *See Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 914.

36

"A jury's decision to reject witness testimony must be rational in light of the totality of the record, and any underlying inferences used to reject that testimony must be reasonable based upon the cumulative force of all of the evidence." *Braughton*, 569 S.W.3d at 611 (citing *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011)). Moreover, a jury may not disregard undisputed objective facts that only has one logical inference. *Id.* "A jury is permitted to reject even uncontradicted defensive testimony, so long as its rejection of that evidence was rational in light of the remaining evidence in the record and is not contradicted by indisputable objective facts." *See id.* at 612 (citing *Saxton*, 804 S.W.2d at 913–14) (other citations omitted). That said, here, Clarabut fails to point us to any part of the record that would render the jury's credibility determinations irrational considering these principles. *See id.*

**Analysis**

Like the *Braughton* case, Appellant's primary contention, both at trial and on appeal, appears to be that he reasonably believed deadly force was immediately necessary because Purvis threatened him with the use of deadly force and appeared to be attempting to obtain a deadly weapon. *See id.* at 611. Clarabut relies on his testimony and that of his expert, Lewis, indicating that Purvis appeared to be turning inside the vehicle, which Lewis described as a "furtive movement" before Clarabut fired. Even so, the jury's implicit rejection of Clarabut's defense in finding him

37

guilty, showed its disbelief in this testimony as not credible, and our legal sufficiency standard does not allow us to substitute our view of the witnesses' credibility for the jury's. *See id.*; *Saxton*, 804 S.W.3d at 913–14. Here, unlike *Braughton*, there was video evidence of the shooting and the events immediately before. The jury was able to watch that evidence, along with frame-by-frame analysis of the timing of the shots compared to Purvis's movements and was free to conclude that Clarabut did not believe deadly force was immediately necessary or that such a belief was unreasonable.

Although Clarabut characterizes the evidence as "undisputed," as in *Braughton*, this was a case that hinged on witness credibility, particularly concerning whether Clarabut believed deadly force was immediately necessary and whether such a belief was reasonable. Indeed, there were several factors Clarabut's expert, Lewis, seemingly did not account for when opining the shooting was justified. Although Lewis pointed to Purvis's not leaving the scene when Clarabut exited his vehicle with a gun, Lewis conceded that Clarabut fired less than two seconds after raising the gun, and it was possible that since Clarabut had the gun at his side initially, Purvis did not see it immediately. The State's expert, Phillips, testified that Purvis crouched or ducked in reaction to Clarabut displaying the firearm, disputing Lewis's claim of a "furtive movement" by Purvis.

38

There are also several reasons the jury could have rejected Clarabut's testimony as not credible. First, Clarabut testified that earlier during the traffic conflicts, Purvis had his hand in his pocket and told him that he had something for him. Yet, Jose disputed Purvis's hands were in his pockets during this interaction. Second, following the incident, Clarabut never reported to 9-1-1 or any police officers that he shot because he was afraid Purvis was reaching for a weapon or that he feared Purvis might shoot him, although Hernandez expressly asked Clarabut if he thought Purvis might have a gun. Rather, immediately after the shooting, Clarabut only said he shot because he thought Purvis was reaching for a door handle to get out of the car. This was inconsistent with Clarabut's trial testimony that he shot because he thought Purvis was reaching for a gun. Finally, Clarabut's admitted anger at the time of the shooting, coupled with his "f*ck off" comment right after shooting Purvis was evidence from which a jury could believe Clarabut was motivated by anger rather than a belief that deadly force was immediately necessary or that Clarabut's anger clouded his judgment to such a degree the belief was unreasonable.

The State's theory was that Clarabut did not believe that deadly force was immediately necessary or if he held that belief, it was unreasonable. They contend he was angry given the traffic conflicts and had already made up his mind when he exited the vehicle and fired the shots in less than four seconds after exiting the truck, as explained by their expert.

39

Thus, we conclude "[t]here is sufficient evidence in the record to rationally support the jury's rejection of appellant's version of events." *See Braughton*, 569 S.W.3d at 611. Although some evidence was undisputed, we disagree with Clarabut's contention that most of the evidence was "undisputed." Even so, a jury may reject even uncontradicted defensive testimony so long as the rejection of that evidence was rational in light of remaining evidence in the record and not contradicted by indisputable objective facts. *See id.*; *Saxton*, 804 S.W.2d at 913–14. Given Clarabut's inconsistent statements to the police after the shooting, competing expert testimony regarding whether the shooting was justified, the camera footage showing the events that occurred that day, and other testimony and physical evidence, we cannot conclude that the jury acted irrationally by declining to believe defensive claims by Clarabut and his experts. Without any evidence that the jury was irrational in rejecting Clarabut's testimony or that of his experts establishing his self-defense claim, we will not substitute or judgment for the jury's. *See Braughton*, 569 S.W.3d at 611.

Viewing the evidence in the light most favorable to the jury's verdict, the jury could have determined that Clarabut did not believe deadly force was immediately necessary or his belief was unreasonable. *See Jackson*, 443 U.S. at 318–19; *Metcalf*, 597 S.W.3d at 855; *Braughton*, 569 S.W.3d at 609; *Hooper*, 214 S.W.3d at 13. As outlined above, self-defense is a fact issue the jury determines, and this jury was free

to accept or reject Clarabut's defensive evidence on the issue. *See Braughton*, 569 S.W.3d at 612–13; *Saxton*, 804 S.W.2d at 913–14. Although the jury is to view the evidence from the defendant's perspective, the defendant's belief must be reasonable that deadly force was immediately necessary. *See* Tex. Penal Code Ann. §§ 9.31(a), 9.32(a); *Gamino*, 537 S.W.3d at 510. The jury was free to weigh the evidence adduced at trial, which among other things, included evidence that Clarabut never mentioned after the shooting he was afraid Purvis was reaching for a gun and instead only shot when he thought Purvis was trying to exit the vehicle. *See Metcalf*, 597 S.W.3d at 855. We do not substitute our judgment for the factfinder's. *See Braughton*, 569 S.W.3d at 608–09, 611; *Williams*, 235 S.W.3d at 750.

The jury's guilty verdict constitutes an implicit finding that it rejected Clarabut's self-defense theory. *See Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 913–14. After viewing all the evidence in the light most favorable to the prosecution, we conclude a rational trier of fact could have found the essential elements of murder beyond a reasonable doubt and found against Clarabut on the self-defense issue beyond a reasonable doubt. *See Braughton*, 569 S.W.3d at 609; *Saxton*, 804 S.W.2d at 914. We overrule Clarabut's first issue.

### ISSUE TWO: JURY CHARGE AND APPARENT DANGER

In his second issue, Clarabut complains the trial court committed harmful error by refusing to include his requested instruction on apparent danger, because it

41

allowed the jury to think that his claim, he could use deadly force in self-defense, was invalid under the law since there was no actual attack on Clarabut by Purvis. In support of this issue, he urges us to disregard *Valentine v. State*, 587 S.W.2d 399 (Tex. Crim. App. [Panel Op.] 1979), and instead follow *Jones v. State*, 544 S.W.2d 139 (Tex. Crim. App. 1976). He also claims that this charge only allowed the jury to convict if there was an actual attack. Finally, in support of this issue, he asserts that the jury's sudden passion finding conflicts with its rejection of self-defense.

**Standard of Review and Applicable Law on Jury Charges**

A claim of jury charge error involves a two-step analysis. *See Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022); *see also Alkayyali v. State*, 713 S.W.3d 780, 789 (Tex. Crim. App. 2025). We first determine whether the charge is erroneous, then if so, we decide whether the appellant was harmed by the erroneous charge. *See Alkayyali*, 713 S.W.3d at 789; *Alcoser*, 663 S.W.3d at 165; *Wooten v. State*, 400 S.W.3d 601, 606 (Tex. Crim. App. 2013). There are two standards of review for charge error claims. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g); *see also Alcoser*, 663 S.W.3d at 165. If a defendant timely objects to the alleged error, the record must only show "some harm" to obtain relief. *Alcoser*, 663 S.W.3d at 165; *Almanza*, 686 S.W.2d at 171. If the defendant fails to timely object, the record must show "egregious harm." *Alcoser*, 663 S.W.3d at 165; *Almanza*, 686 S.W.2d at 171. We assess harm "in light of the entire jury

charge, the state of the evidence, including the contested issues and weight of [the] probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171; *see also Alcoser*, 663 S.W.3d at 165.

The trial court must submit a jury charge "distinctly setting forth the law applicable to the case[.]" Tex. Code Crim. Proc. Ann. art. 36.14. The charge should inform the jury of the applicable law and how to apply it to the case's facts. *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007) (citation omitted); *see also Alcoser*, 663 S.W.3d at 164–65. "Abstract paragraphs 'serve as a glossary to help the jury understand the meaning of concepts and terms used in the application paragraphs of the charge, and application paragraphs apply the 'pertinent penal law, abstract definitions, and general legal principles to the particular facts and the indictment allegations.'" *Alcoser*, 663 S.W.3d at 165 (quoting *Crenshaw v. State*, 378 S.W.3d 460, 466 (Tex. Crim. App. 2012)). Generally, a trial judge should avoid including non-statutory instructions in the charge because they often constitute impermissible comments on the weight of the evidence. *See Beltran De La Torre v. State*, 583 S.W.3d 613, 617 (Tex. Crim. App. 2019); *Walters v. State*, 247 S.W.3d 204, 211 (Tex. Crim. App. 2007).

We have already outlined elsewhere in this opinion that "a person is justified in using force against another when and to the degree the actor reasonably believes

43

the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." Tex. Penal Code Ann. § 9.31(a). As applicable here, a person is justified in using deadly force against another if he would be justified in using force, and he reasonably believes deadly force is immediately necessary to protect himself or others against the other person's use or attempted use of unlawful deadly force. *See id.* § 9.32(a). The Penal Code also defines "reasonable belief" as "a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." *Id.* § 1.07(42).

## Analysis

Regarding self-defense, the charge's abstract section instructed the jury as follows:

> Upon the law of self-defense, you are instructed that a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the others use or attempted use of unlawful force.
> A defendant is justified in using deadly force against another if the actor would be justified in using force against the other, as set out above, and when and to the degree the actor reasonably believes the deadly force is immediately necessary to protect the actor against the other's use or attempted use of unlawful deadly force.
> The use of force against another is not justified in response to verbal provocation alone.
> A person who has a right to be present at the location where the deadly force is used, who has not provoked the person against whom the deadly force is used, and who is not engaged in criminal activity at the time the deadly force is used is not required to retreat before using deadly force.

44

For purposes of determining whether an actor reasonably believed that the use of deadly force was necessary, you may not consider whether the actor failed to retreat.

The threat of force is justified when the use of force is justified. A threat to cause death or serious bodily injury by the production of a weapon or otherwise, as long as the actor's purpose is limited to creating an apprehension that he will use deadly force if necessary, does not constitute the use of deadly force.

You are instructed that you may consider all relevant facts and circumstances surrounding the death, if any, and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense, if any.

The charge defined "reasonable belief" as "a belief that would be held by an ordinary and prudent person in the same circumstances as the actor." The charge further defined "deadly force" as "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury."

The application portion of the charge addressed self-defense. It first instructed the jury to consider whether Clarabut committed all the elements of murder, and if they found he did not, they must acquit him. The charge then instructed the jury regarding the consequences of its findings or failure to find that Clarabut's belief that his conduct was immediately necessary to protect himself against Purvis's "use or attempted use of unlawful deadly force." It instructed the jury to acquit Clarabut unless the State proved beyond a reasonable doubt that (1) Clarabut's use of force was in response to verbal provocation alone, (2) Clarabut did not believe his conduct

45

was immediately necessary, or (3) believed his conduct was immediately necessary, but his belief was not reasonable. The charge further instructed that if the State proved one of those beyond a reasonable doubt and the jury also found Clarabut committed all the elements of murder as defined in the charge, it would find him guilty of murder. Here, the trial court's charge tracked the self-defense statutes. *See id.* §§ 9.31, 9.32; *see also* Tex. Code Crim. Proc. Ann. art. 36.14. It also provided the statutory definition, verbatim, of reasonable belief. *See* Tex. Penal Code Ann. § 1.07(42).

Clarabut requested the following non-statutory, apparent-danger instruction:

When a person is attacked with unlawful deadly force, or the person reasonably believes they are under attack or an attempted attack with unlawful deadly force, and there is created in the mind of such person a reasonable expectation or fear of death or serious bodily injury to himself, then the law excuses or justifies such person in resorting to deadly force by any means at his command to the degree that he reasonably believes it to be immediately necessary, viewed from his standpoint at the time, to protect himself from such attack or attempted attack.

It is not necessary that there be an actual attack or attempted attack as a person has a right to defend his life and person from apparent danger as fully and to the same extent as he would had the danger been real, provided that he acted upon a reasonable apprehension of danger, as it appeared to him from his standpoint at the time, and that he reasonably believed such deadly force was immediately necessary to protect himself against the other person's apparent use or attempted use of unlawful deadly force.

In determining the existence of real or apparent danger, you should consider all the facts and circumstances in the case in evidence before you, together with all relevant facts and circumstances going to show the condition of the mind of the Defendant at the time of the occurrence in question, and in considering such circumstances, you

46

should place yourselves in the Defendant's position at that time and view them from his standpoint alone.

It should be noted that Clarabut conceded to the trial court that it would not err by excluding this instruction.

Our sister court in Austin concluded the trial court did not err when it refused a similar apparent-danger instruction. *See Bundy v. State*, 280 S.W.3d 425, 429–31 (Tex. App.—Austin 2009, pet. ref'd). There, the court explained that where a defendant claims self-defense, his rights are fully preserved and the concept of "apparent danger" properly presented when a charge instructs the jury (1) that a defendant's conduct is justified if he reasonably believed the deceased was using or attempting to use unlawful deadly force against him, and (2) correctly defines "reasonable belief." *See id.* at 430 (citations omitted). This charge did so, and we have reached similar conclusions where a non-statutory, apparent-danger instruction was refused. *See Jordan v. State*, No. 09-22-00205-CR, 2024 WL 3959238, at *30 (Tex. App.—Beaumont Aug. 28, 2024, no pet.) (mem. op., not designated for publication) (citing *Bundy*, 280 S.W.3d at 430); *Dotson v. State*, No. 09-08-00323-CR, 2009 WL 5205359, at *1 (Tex. App.—Beaumont Dec. 30, 2009, pet. ref'd) (mem. op., not designated for publication).

Another sister court in Houston explained, *Bundy's* rationale is based on *Valentine*, 587 S.W.2d at 401 ("By defining the term 'reasonable belief' as it did, the court instructed the jury that a reasonable apprehension of danger, whether it be

47

actual or apparent, is all that is required before one is entitled to exercise the right of self-defense against his adversary."). *See Fish v. State*, 609 S.W.3d 170, 180 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd). The *Valentine* court distinguished its prior decision in *Jones*, which held that a defendant was entitled to a separate instruction on apparent danger because the charge erroneously required the deceased to have been using or attempting to use unlawful deadly force for the jury to find for the defendant on the issue of self-defense. *See id.* (discussing differences between *Valentine* and *Jones*). We are bound by precedent and conclude the charge in *Valentine* is more like the one before us. We decline Clarabut's invitation to rely on *Jones*.

Clarabut also contends that the jury's sudden-passion finding is inconsistent with its rejection of his self-defense claim, particularly where the trial court refused his apparent-danger instruction. We disagree. Sudden passion and self-defense are separate concepts addressed at two phases of trial and in separate jury charges. As explained above, apparent danger is encompassed during the guilt/innocence phase within the confines of self-defense, and sudden passion is a mitigating circumstance addressed at punishment. *See* Tex. Penal Code Ann. § 19.02(d); *Beltran v. State*, 472 S.W.3d 283, 293 (Tex. Crim. App. 2015).

"'Sudden passion' means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which

passion arises at the time of the offense and is not solely the result of former provocation." Tex. Penal Code Ann. § 19.02(a)(2). Adequate cause is a "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1). Self-defense is not an affirmative defense; the burden of production is on the defendant, but the burden of persuasion is on the State. *See Zuliani*, 97 S.W.3d at 594. In contrast, the defendant has the burden of production and persuasion on the issue of sudden passion. *See* Tex. Penal Code Ann. § 19.02(d); *Wooten*, 400 S.W.3d at 605. The Court of Criminal Appeals has explained that "sudden passion and self-defense are not mutually exclusive." *Beltran*, 472 S.W.3d at 290 (citation omitted). "A jury's rejection of self-defense at the guilt/innocence phase does not preclude submission of a sudden passion issue at the punishment phase." *Id.* A jury could rationally conclude that a defendant was not justified in using deadly force, yet still find he was under the influence of sudden passion, thus mitigating his punishment. The jury's rejection of self-defense but affirmative finding on sudden passion is not inconsistent in this case. *See id.*

For these reasons, we hold the trial did not err in refusing Clarabut's non-statutory, apparent-danger instruction. We overrule issue two.

49

## CONCLUSION

Having overruled Clarabut's issues, we affirm the trial court's judgment.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on September 11, 2025
Opinion Delivered October 1, 2025
Do Not Publish

Before Golemon, C.J., Johnson and Wright, JJ.